FILED

2025 Jul-11  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN KENDALL MITCHELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOHN Q. HAMM,** | ) | **Case No.:** |
| **GREG LOVELACE,** | ) | |
| **EDWARD ELLINGTON,** | ) | **JURY TRIAL DEMANDED** |
| **PHYLLIS MORGAN,** | ) | |
| **ASSISTANT WARDEN 1,** | ) | |
| **ASSISTANT WARDEN 2,** | ) | |
| **MICHAEL T. WHEAT,** | ) | |
| **MYRIS L. BELL,** | ) | |
| **RICHARD W. GODSEY,** | ) | |
| **COREY O. FOX,** | ) | |
| and | ) | |
| **JOHN DOE LESD OFFICER 1,** | ) | |
| *in their individual capacities*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff John Kendall Mitchell brings this action pursuant to 42 U.S.C. § 1983 for violations of his rights under the Constitution the United States and Alabama State law. Plaintiff seeks compensatory and punitive damages, attorneys' fees, expenses and costs, and any other relief the Court deems appropriate. Plaintiff demands a trial by jury.

### JURISDICTION AND VENUE

1. This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights under the Eighth Amendment to the United States Constitution.

2. This Court has subject matter jurisdiction over Plaintiff's constitutional claims under 28 U.S.C. §§ 1331 and 1343(a).

3. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

4. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## PARTIES

### *Plaintiff*

5. Plaintiff John Kendall Mitchell, who goes by "Kendall," is incarcerated within the Alabama Department of Corrections ("ADOC"). At the time of the filing of this Complaint, Kendall was incarcerated at Red Eagle Community Work Center ("Red Eagle") in Montgomery County, Alabama. At different times relevant to this Complaint, Plaintiff was incarcerated at Donaldson Correctional Facility ("Donaldson") in Jefferson County, Alabama; at Ventress Correctional Facility ("Ventress") in Barbour County, Alabama; at Bullock Correctional Facility ("Bullock") in Bullock County, Alabama; and at Staton Correctional Facility ("Staton") in Elmore County, Alabama..

### *The Defendant Administrative Supervisors*

6. Defendant John Q. Hamm is the Commissioner of the ADOC, the state agency that administers the prison system in Alabama. He has held that position since January 1, 2022, and he held that position at all times relevant to this Complaint. As Commissioner, Defendant Hamm is the highest-ranking official in the ADOC, and he is responsible for the direction, supervision, and control of the ADOC and its employees. Defendant Hamm personally supervises the activities of the ADOC and its employees, and he is responsible for ensuring that ADOC employees are properly trained to perform their assigned duties and are properly carrying out their assigned duties. He is responsible for setting departmental policies and customs at the ADOC and its facilities; overseeing institutional policies and customs at ADOC facilities; supervising the

adoption of changes in departmental and institutional policies and customs as needed; and planning, directing, controlling, and otherwise managing ADOC facilities to ensure the safety and security of its prisoners. As Commissioner, Defendant Hamm is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

7.      Defendant Greg Lovelace is the Chief Deputy Commissioner of Corrections of the ADOC. He has held that position since in or about May 2022, and he held that position at all times relevant to this Complaint. As Chief Deputy Commissioner, Defendant Lovelace is responsible for the management and oversight of all operations and administrative divisions of the ADOC and its facilities. Defendant Lovelace personally supervises the activities of the ADOC and its employees, and he is responsible for implementing the rules, regulations, procedures, and standards governing the administration of the prison system in Alabama. He is responsible for ensuring the effective and safe daily operations of all prison facilities. As Chief Deputy Commissioner, Defendant Lovelace is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

8.      Defendant Edward Ellington is the Institutional Coordinator for the Northern Region of the ADOC, which includes Donaldson and Staton. He has held that position since in or about 2017, and he held that position at all times relevant to this Complaint. As Institutional Coordinator, Defendant Ellington is responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in his assigned area, including Donaldson and Staton. His duties include supervising the wardens of Donaldson and Staton, ensuring safe conditions at Donaldson and Staton, and leading the external security audit team. As Institutional Coordinator, Defendant Ellington is a final policymaker for the Department and has a duty to exercise ordinary

3

and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

9.    Collectively, Defendants Hamm, Lovelace, and Ellington are referred to as the "Defendant Administrative Supervisors."

### *The Defendant Facility Supervisors*

10.    Defendant Phyllis Morgan was the Warden of Donaldson at all times relevant to this Complaint. As Warden, Defendant Morgan was responsible for the day-to-day operations of Donaldson, the safety and security of all prisoners there, and the supervision of all subordinate employees. Her responsibilities as Warden included ensuring adequate supervision and monitoring of prisoners; adequate classification of prisoners; appropriate housing assignments for prisoners; adequate staffing levels; appropriate discipline and deterrence of prisoner and staff misconduct; adequate implementation of internal security audits; and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security. As Warden, Defendant Morgan was a final policymaker for Donaldson and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Donaldson. She is sued in his individual capacity.

11.    Defendant Assistant Wardens 1 and 2 were assistant wardens at Donaldson at all times relevant to this Complaint. As Assistant Warden, Defendant Streeter was responsible for the day-to-day operations of Donaldson, the safety and security of all prisoners there, and the supervision of all subordinate employees. Their responsibilities as assistant wardens included ensuring adequate supervision and monitoring of prisoners; adequate classification of prisoners; appropriate housing assignments for prisoners; adequate staffing levels; appropriate discipline and deterrence of prisoner and staff misconduct; adequate implementation of internal security audits; and proper installation, repair, and maintenance of locks, cameras, and other security devices

4

necessary for safety and security. As assistant wardens, Defendants Assistant Wardens 1 and 2 were final policymakers for Donaldson and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Donaldson. They are sued in their individual capacities.

12.     Together, Defendants Morgan and Defendants Assistant Wardens 1 and 2 are referred to as the "Defendant Facility Supervisors."

### The Defendant Correctional Officers

13.     Defendant Michael T. Wheat is a correctional captain at Donaldson, and he held that position at all times relevant to this Complaint. As Captain, Defendant Wheat was responsible for the safety of all prisoners at Donaldson; for monitoring and supervising security activities, and for ensuring that subordinate staff were where they were supposed to be, carrying out their responsibilities, and following ADOC and facility security procedures. Defendant Wheat was responsible for monitoring prisoners and housing units; addressing and investigating inmate reports of physical and sexual assault; searching for and confiscating contraband; and supervising subordinate staff in carrying out those activities. Defendant Wheat was also responsible for ensuring that prisoners were safe and were safely housed, and he had the authority to adjust a prisoner's housing assignment. As Captain, Defendant Wheat had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Donaldson. He is sued in his individual capacity.

14.     Defendant Myris L. Bell is a correctional lieutenant at Donaldson, and he held that position at all times relevant to this Complaint. As Lieutenant, Defendant Bell was responsible for the safety of all prisoners at Donaldson; for monitoring and supervising security activities, and for ensuring that subordinate staff were where they were supposed to be, carrying out their responsibilities, and following ADOC and facility security procedures. Defendant Bell was

responsible for monitoring prisoners and housing units; addressing and investigating inmate reports of physical and sexual assault; searching for and confiscating contraband; and supervising subordinate staff in carrying out those activities. Defendant Bell was also responsible for ensuring that prisoners were safe and were safely housed, and he had the authority to adjust a prisoner's housing assignment. As Lieutenant, Defendant Bell had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Donaldson. He is sued in his individual capacity.

15.     Defendant Richard W. Godsey is a correctional sergeant at Donaldson, and he held that position at all times relevant to this Complaint. As Sergeant, Defendant Godsey was responsible for monitoring prisoners and housing units; addressing and investigating inmate reports of physical and sexual assault; searching for and confiscating contraband; and supervising subordinate staff in carrying out those activities. Defendant Godsey was also responsible for ensuring that prisoners were safe and were safely housed, and he had the authority to adjust a prisoner's housing assignment. As a correctional sergeant, Defendant Godsey had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Donaldson. He is sued in his individual capacity.

16.     Defendant Corey O. Fox is a senior correctional officer at Donaldson, and he held that position at all times relevant to this Complaint. As a correctional officer, Defendant Fox was responsible for monitoring prisoners and housing units; addressing and investigating inmate reports of physical and sexual assault; and searching for and confiscating contraband. Defendant Fox was also responsible for ensuring that prisoners were safe and were safely housed, and he had the authority to adjust a prisoner's housing assignment. As a correctional officer, Defendant Fox had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Donaldson. He is sued in his individual capacity.

17. Together, Defendants Wheat, Bell, Godsey, and Fox are referred to as the "Defendant Correctional Officers."

### *Additional Defendants*

18. Defendant John Doe LESD Officer 1 is an officer with the ADOC's Law Enforcement Services Division ("LESD"). The LESD is the primary investigative unit within the ADOC, and it is responsible for investigating violations of the law within ADOC facilities, including inmate reports of physical and sexual assaults. Defendant John Doe LESD Officer 1 was the LESD officer assigned to investigate Kendall's July 2023 rape. As the assigned investigating officer, Defendant John Doe LESD Officer 1 had a duty to conduct a reasonable and thorough investigation and to comply with all requirements of the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, *et seq.* As an LESD officer, Defendant John Doe LESD Officer 1 had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

19. Kendall is a nonviolent offender with a criminal history of property crimes stemming from a drug addiction.

20. On February 28, 2023, Kendall was transferred to Donaldson. Donaldson is a Level V, or "close custody" facility—the highest security level an Alabama prison can have. Level V facilities are designed to house some of the most dangerous prisoners: close custody inmates, inmates sentenced to life without parole, and medium custody inmates that require additional security.

21. At Donaldson, Kendall was assigned to L-block, a population dorm that housed approximately 200 prisoners.

22.    Days after Kendall arrived at Donaldson, he started being threatened and extorted by other inmates. An inmate in L-block who had a cell phone pulled Kendall's picture up from the ADOC website and walked around telling other inmates in the dorm that Kendall owed money to an inmate at another facility. The inmate told Kendall he needed to pay him $150 for this fabricated "debt."

23.    Kendall paid the inmate, but the threats and extortion did not stop. Kendall's family typically deposited about $50 onto his personal account each week so Kendall could buy items from the prison's commissary. For the next several months, inmates in L-block "charged" Kendall for his safety, stealing all his commissary items every week in exchange for not beating him up or raping him.

24.    In these months, Kendall tried multiple times to get help from correctional officers about the threats and extortion. He approached many different correctional officers to ask for protection, to be moved to a different dorm, or to be transferred to a safer facility. No correctional officer ever tried to help him. Officers would frequently ignore him. If they didn't ignore him, they would respond in ways that ranged from merely dismissing the danger he faced to compromising his safety even further. When Kendall told officers he was being threatened, extorted, and made to pay fabricated "debts," officers told him they "didn't have time" for his issues or they "didn't want to hear about" them. Officers told Kendall to "suck it up"; to "be a man about it"; to "man up and deal with it himself"; or to "pay his debts and stop getting high." Officers told Kendall to "fuck off about it"; to "get the fuck out of here"; or that they "didn't give a fuck about it." Sometimes, officers would announce to everyone in the vicinity—officers and inmates alike—that Kendall was "trying to catch out," a phrase used in prisons to refer to a situation in which an inmate falsely reports threats to his safety to avoid paying debts or fulfilling his responsibilities. Such an

announcement had the effect of informing everyone nearby that Kendall had reported a threat of some kind and would almost certainly be labeled a "rat."

25.   During the time Kendall was assigned to L-block, the dorm was overrun with weapons, drugs, and other contraband.

26.   At any given time, about half of L-block's 200 inmates had knives—either prison-made or so-called "free-world" knives. Prison-made knives—or "shanks"—vary widely in size and shape and are made from metal cut from wherever it is available; they are often made from pieces of fences, beds, light fixtures, dish racks, cooking utensils, or lawnmowers. The metal is shaped and sharpened and attached to a handhold made from wood, plastic, fabric, or any other non-sharp material. Shanks vary in length from less than one inch to more than one foot, and they vary in shape from as thin and pointy as an icepick to as thick and broad as a machete. "Free-world" knives are knives that are available for purchase outside of prison. The term includes box-cutters, pocketknives, switchblades, hunting knives, kitchen knives, and any other kind of commercially available knife.

27.   In addition to knives, inmates in L-block had and used weapons of all other kinds. Inmates would pull the legs off chairs or tables; they would break the handles off brooms and mops; they would put locks or stones inside socks. Several inmates in the dorm had weapons made of several mop handles tied together to make one large stick.

28.   Drugs were ubiquitous in L-block, and drug use was conspicuous and constant. At all times of the day, numerous people were obviously high. At least a dozen people passed out each day from drug use. Officers had to use Narcan almost daily to revive someone from a drug overdose.

9

29.     A similar proportion of the dorm, about half, had cell phones. Cell phones were essential for maintaining the flow of drugs, weapons, and contraband within a facility, as well as for ensuring that debts were collected, perceived wrongdoings were retaliated for, and extortion was perpetuated. Inmates used cell phones to coordinate the import of drugs and contraband into the prison; to exchange information with inmates at other facilities; and to extort other inmates' family members, making phone calls or sending text, video, or audio messages threatening to physically or sexually assault the inmate if the family member did not send money.

30.     Despite the prevalence of weapons and contraband, officers rarely conducted contraband searches—or "shakedowns"—in L-block. In the nine months that Kendall was in the dorm, shakedowns occurred only four or five times. Even when officers did conduct shakedowns, they rarely confiscated cell phones or contraband; or, if they did confiscate the items, they would later return them. Once, during Kendall's time in L-block, an inmate's cell phone fell out of his pocket in front of a correctional officer. The officer took the cell phone, but the officer's runner (an inmate who functions like a personal or administrative assistant) returned the phone to the inmate shortly later.

31.     Because weapons were so ubiquitous, inmate-on-inmate assaults almost always involved a weapon; fistfights or beatings by hand were rare.

32.     The inmates in L-block were left completely unsupervised. The only times correctional officers came into L-block were to conduct the institutional count several times a day. The dorm was unlocked and inmates let out to go to meals and for pill call. Other than that, inmates in L-block had no contact at all with correctional officers. Officers were never inside the dorm supervising, and inmates had no way to contact officers from inside the dorm.

10

33. The sole method of supervision for L-block was via cameras that were supposedly monitored by a single officer stationed in a guard shack that was across the yard from L-block. The officer in the guard shack was responsible for monitoring the cameras in L-block and four other dorms. Inmates had no way to communicate with the officer in the guard shack. And it was not uncommon while Kendall was at Donaldson for the guard shack to be empty.

34. There was a small room in the corner of L-block. The room had previously been a hobby craft room, but that purpose had been changed long before Kendall got there. While Kendall was in L-block, the room was a place where inmates did drugs, charged cell phones, and made alcohol. Correctional officers had let inmates in L-block put a combination lock on the outside of door to the room. Some inmates in L-block had the combination to the lock, so the room could be locked and unlocked only by certain inmates.

35. After months of being extorted and subjected to violence within L-block, the threats to Kendall's safety escalated. Early one morning in late July, two inmates who were assigned to another dorm forced Kendall into the hobby craft room and raped him.

36. For about the next two weeks, Kendall tried numerous times to report his rape to correctional officers. Each time he tried to talk to an officer about it, they either ignored him or told him they did not have time to help him.

37. Two days after the rape, Kendall went to the captain's office. Defendant Wheat was there, and Kendall told Defendant Wheat he had been raped and needed to report it. Defendant Wheat said, "I ain't got time for this, get out of here."

38. Several days later, Kendall tried to report the rape to Defendant Bell, who was supervising pill call. Defendant Bell refused to listen to or help Kendall. Instead, he said loudly to

11

all the inmates waiting for pill call, "Hey guys, he's trying to catch out. He's telling everyone he got raped."

39.     After about two weeks, Kendall was able to get into the infirmary and speak to an officer and medical staff who were willing to listen to his report of being raped.

40.     After finally being allowed to report the rape, Kendall was placed briefly in lockup for safekeeping.

41.     Several days later, Kendall met with Defendant Fox and Defendant John Doe LESD Officer 1. Both defendants discouraged Kendall from officially reporting the rape, telling him they would be unable to keep him safe from retaliation by other inmates if he reported the rape.

42.     Defendant Fox told Kendall, "If you want to report this, we'll lock the guy up and send you back to population. And you know what's going to happen if you go back to population."

43.     Defendant John Doe LESD Officer 1 told Kendall that he was not going to stop him from officially reporting the rape, but that Kendall was the one who "had to live" at Donaldson and that Defendant John Doe LESD Officer 1 could not keep other inmates from assaulting Kendall.

44.     After speaking with Defendant Fox and Defendant John Doe LESD Officer 1, Kendall declined to officially report his rape because he was afraid of being retaliated against by his rapists or their friends.

45.     Kendall went back to lockup for several hours, and then the lieutenant supervising the lockup unit told Kendall he was going to be sent back to population. Kendall told that lieutenant that he could not go back to population because he would be beaten up for having reported—albeit unofficially—his rape. The lieutenant told Kendall, "You better figure something out because you're going."

46.    Kendall was sent to meet with Defendant Godsey to get a bed assignment. Kendall told Defendant Godsey that he could not be placed in population because he would not be safe. Defendant Godsey asked, "Is there somewhere I can send you?" Kendall asked to go back to lockup, and Defendant Godsey said, "You can't go back to lockup. Those cells aren't for hiding and catching out. You ain't got no PREA case, you're trying to catch out. You went up there and lied to them." Defendant Godsey told Kendall he was going to send him back to L-block and give him his old be assignment. "You ain't got raped. You lied. I ain't got time to play with your bullshit." Kendall begged Defendant Godsey not to send him back to L-block, and Defendant Godsey responded, "Get the hell out of here before I beat your ass."

47.    Because he had no other option, Kendall went back to L-block.

48.    As soon as Kendall walked into the dorm, multiple inmates and members of two different gangs approached him and called him a rat. Kendall was immediately threatened and constantly extorted.

49.    For the next approximately two weeks, every time Kendall could speak with a correctional officer, he asked to be moved to Donaldson's honor dorm, which was known to be safer than L-block.

50.    Once, Kendall asked Defendant Godsey to move him to the honor dorm. Defendant Godsey responded, "You're not moving down there, and if you go behind my back, I'll move you back out."

51.    One afternoon, about two weeks after he had been put back in L-block, Kendall was severely beaten by multiple inmates inside L-block.

52.    Kendall was taken to UAB, where he stayed for several days.

53. When Kendall was released from the hospital, he was taken back to Donaldson. He spent one night in the infirmary and was then sent back to population.

54. Defendant Godsey was again responsible for giving Kendall a housing assignment. Defendant Godsey told Kendall he was going to assign him to Y-block Y-block was known to be a dangerous dorm that housed many dangerous inmates and inmates who have sentences of life imprisonment without the possibility of parole.

55. Kendall told Defendant Godsey that he would not be safe in Y-block and asked for a different bed assignment. Defendant Godsey said, "I don't give a fuck, this is the only bed I've got."

56. About one month after Defendant Godsey housed Kendall in Y-block, Kendall's cellmate started sexually assaulting him. Kendall moved into a cell with another inmate, and after several days, that inmate began raping him.

57. For about the next two weeks, Kendall's cellmate repeatedly raped him. Kendall consistently tried to report the ongoing rape to correctional officers, but they again ignored him or outright refused to help him.

58. One day, Kendall went to the captain's office to try to report the ongoing rapes and be moved to safety. Captain Wheat was in the office, and Kendall told him that he was being raped and needed to be moved to a different dorm. Defendant Wheat said, "You're not being raped. You've run out of PREA reports," and sent Kendall back to his dorm.

59. After about two weeks of seeking help from correctional officers and being refused, Kendall went to the infirmary, cut his wrist in front of the medical staff, and told them he was suicidal. The medical staff initially dismissed Kendall and told him to go back to his dorm. Knowing that it was the only way to get away from his cellmate's ongoing rapes, Kendall cut

himself again, deeper and longer this time. Kendall began bleeding profusely and medical staff were forced to treat him. As he was being bandaged up, he told medical staff that he had been raped.

60.    Kendall was placed in a suicide cell for several days and then moved to a lockup cell. He was eventually transferred to Elmore Correctional Facility.

### The Widespread History of Unconstitutional Conditions Within the ADOC

61.    Conditions inside Alabama's prisons have historically been among the worst in the nation. The prisons are overcrowded and understaffed. Inmate-on-inmate violence is common. Drugs are ubiquitous. It is the norm, not the exception, for prisoners to have weapons. These conditions have existed for years, and Defendants have known about them.

62.    In October 2016, the U.S. Department of Justice ("DOJ") opened a statewide investigation into the conditions of Alabama's prisons for men. The investigation focused on whether prisoners are adequately protected from physical harm and sexual abuse by other prisoners; whether prisoners are adequately protected from excessive force and sexual abuse by correctional officers; and whether the prisons provide safe, sanitary, and secure living conditions.[1]

63.    The DOJ published the report of its investigation in April 2019.[2] The report concluded that reasonable cause existed to believe that "Alabama routinely violates the

---

[1] Press Release, U.S. Dep't of Justice, *Justice Department Announces Statewide Investigation into Conditions in Alabama's Prisons for Men* (Oct. 6, 2016), *available at* https://www.justice.gov/usao-mdal/pr/justice-department-announces-statewide-investigation-conditions-alabama-s-prisons-men.

[2] Press Release, U.S. Dep't of Justice, *Justice Department Alleges Conditions in Alabama Men's Prisons Violate the Constitution* (April 3, 2019), *available at* https://www.justice.gov/opa/pr/justice-department-alleges-conditions-alabama-mens-prisons-violate-constitution; Letter from the U.S. Dep't of Justice, Notice Regarding Investigation of Alabama's State Prisons for Men (April 2, 2019), *available at* https://www.justice.gov/opa/press-release/file/1150276/download ("April 2019 Report").

constitutional rights of prisoners housed in the Alabama's prisons [sic] by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions," and that the violations "are exacerbated by serious deficiencies in staffing and supervision and overcrowding."[3]

64.    The DOJ's investigation "revealed that an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."[4]

65.    At the time of the DOJ's investigation, Alabama's prisons for men had the highest homicide rate in the country. Its 2017 homicide rate was 56 per 100,000 prisoners—approximately eight times the 2014 national average homicide rate of 7 per 100,000 prisoners.

66.    That homicide rate has since gone up. In 2022, there were at least eighteen homicides across all ADOC facilities, which housed approximately 19,978 prisoners. That corresponds to a homicide rate of 90 per 100,000 prisoners—more than seven times the 2019 national average homicide rate for state prisoners of 12 per 100,000 prisoners.

67.    The overall death rate (not just by homicide) in Alabama's prisons is also well above the national average. In 2019, the national average overall mortality rate for state prisoners was 330 per 100,000 prisoners. In 2022, the ADOC reported 266 total deaths across its prisons— a mortality rate of 1,330 per 100,000 prisoners, or nearly five times the 2019 national average.

68.    Drugs and deadly drug overdoses are also common in Alabama's prisons. Approximately sixty-nine individuals died drug-related deaths in 2022—a death rate of 345 per 100,000 prisoners. The 2019 national average drug-related death rate for state prisoners was 22

---

[3] *Id.* at 1

[4] *Id.* at 2.

per 100,000 prisoners, meaning that Alabama's 2022 drug overdose rate was more than three times the 2019 national average.

69.    The prevalence of drugs in Alabama's prisons is dangerous for reasons beyond overdoses.  Prisoners under the influence of drugs behave violently and erratically toward other prisoners, and drug debts fuel assaults, extortion, and sexual abuse. Alabama prisoners are "subjected to severe violence related to the [prison] drug trade."[5]

70.    Alabama's prisons are also full of weapons. In 2022, the ADOC reported confiscating 6,289 weapons, including sixteen firearms. Alabama's total prison population that year was 19,978 people, equating to one weapon confiscated for every 3.2 people.

71.    Exacerbating all these dangers, Alabama's prisons are extraordinarily overcrowded.

72.    In 2022, the ADOC reported a year-end total population of 19,978 people. Those prisoners were housed in facilities designed for 12,115 people, meaning that Alabama's prisons operated in 2022 at 164% of capacity. In 2017, when operating at 167.8% of capacity, Alabama's prisons were the most overcrowded prisons in the country.

73.    Overcrowded prisons are dangerous for many reasons. Alabama, like many states, responded to prison overcrowding by converting common areas into "open dormitories"—large rooms filled with bunk beds packed closely together. These makeshift living arrangements create visibility problems because officers cannot see across the dormitory to monitor all the prisoners. Overcrowding also creates more competition for the use of all resources—showers, toilets, phones, recreational equipment, and space. These characteristics increase the likelihood that conflicts will

---

[5] April 2019 Report at 30–31.

erupt between prisoners and decrease the likelihood that officers will be able to effectively respond to those conflicts.

74.     Alabama's prisons are also woefully understaffed.

75.     The ADOC's staffing problems have been the subject of numerous legislative hearings, lawsuits, and news reports. The ADOC has been under court order for years to increase its staffing levels.

76.     Despite the court order, its staffing levels are not improving.

77.     In fiscal year 2017, the ADOC reported "critical shortages in correctional officer staffing."[6]

78.     In February 2019, it reported that it needed to hire more than 2,000 correctional officers and 125 correctional supervisors to adequately staff its men's prisons.

79.     The ADOC's understaffing problems were even worse in the years before and during Kendall's assaults. For the quarter ending December 2022, the ADOC reported a correctional staff vacancy rate of 65.40% across its entire prison system. That same quarter, the ADOC reported that only two of its major facilities were staffed at more than 60%. In contrast, five of its major facilities were staffed at less than 30%; four more were staffed at less than 40%; and two more were staffed at less than 50%. One of the ADOC's major facilities had less than 20% of the correctional staff it needed to operate safely.

80.     The extreme understaffing means that prisoners are "unsupervised and largely left to their own devises."[7] Dorms of hundreds of inmates are regularly supervised by one officer. Other dorms are entirely unsupervised—officers come into the dorms only to count the prisoners

---

[6] Annual Legislative Report, Fiscal Year 2017, Ala. Dep't Corr. (Feb. 13, 2018) at 4, *available at* https://doc.alabama.gov/docs/AnnualRpts/2017AnnualReport.pdf.

[7] April 2019 Report at 47.

several times a day. Most dorms remain locked, leaving hundreds of prisoners confined in an overcrowded space with no supervision and no reliable way to access help in the case of an emergency. Prisoners injured in fights, sexually assaulted, or who overdosed on drugs often wait hours before they can leave the dorms to get help. Seriously injured prisoners have died while locked in dorms without access to medical attention.

81.    The combination of overcrowding and understaffing across Alabama's prisons "results in prisons that are inadequately supervised, with inappropriate and unsafe housing designations, creating an environment rife with violence, extortion, drugs, and weapons."[8]

### The Widespread History of Unconstitutional Conditions at Donaldson

82.    The conditions described above were especially prevalent at Donaldson.

83.    Donaldson is a Level V, or "close custody" facility—the highest security level an Alabama prison can have. Level V facilities are designed to house some of the most dangerous prisoners: close custody inmates, inmates sentenced to life without parole, and medium custody inmates that require additional security.

84.    Not only does Donaldson house some of Alabama's most dangerous offenders, but these offenders are packed tightly together.

85.    In February 2023, when Kendall arrived there, Donaldson housed 1,329 inmates, meaning that it was operating at 137% capacity.

86.    Donaldson was also dangerously understaffed.

87.    According to the ADOC, for the quarter ending on December 31, 2022, Donaldson was operating with only 29.5% of the correctional officers required to run the facility: 365 full-time correctional officers were required, but Donaldson had only 120.5 full-time officers.

---

[8] *Id.* at 5.

88.     Donaldson was also a dangerous facility: deaths, assaults, drugs, and weapons were common.

### *Defendants Knew of the Unconstitutional Conditions at Donaldson*

89.     By virtue of their positions in the ADOC, all Defendants knew about the conditions at Donaldson, including the overcrowding and understaffing, the widespread violence, the ubiquity of weapons and drugs, and the resulting risk of harm to Donaldson's inmates.

90.     It is part of the Defendant Administrative Supervisors' jobs to be aware of trends in the ADOC population, including correctional staffing and inmate population rates, mortality rates, assault rates, and contraband confiscation rates, as is being aware of those trends at each specific ADOC facility, including Donaldson. It is part of the Defendant Facility Supervisors' jobs to be aware of those same trends specific to Donaldson and to review reports of specific deaths, assaults, and contraband confiscations at Donaldson. And because their daily duties included supervising inmates and searching for contraband, the Defendant Correctional Officers were aware firsthand of the overcrowding and understaffing, the high rates of deaths and assaults, and the prevalence of drugs and weapons at Donaldson.

91.     Furthermore, when Kendall was at Donaldson, it was common knowledge among staff and supervisors at Donaldson and within the ADOC, including all Defendants, that the inmate population at Donaldson and across the ADOC was heavily armed. Weapons were so prevalent that correctional officers frequently recommended that inmates obtain and use weapons to protect themselves.

92.     It was also common knowledge among staff and supervisors at Donaldson and within the ADOC, including all Defendants, that the combination of understaffing and overcrowding significantly increased violence within prisons and the risk of harm to inmates.

93. And it was common knowledge among staff and supervisors at Donaldson, including the Defendant Facility Supervisors and the Defendant Officers, that most correctional staff at Donaldson spent significant amounts of their time on shift socializing with each other, watching television, sleeping, or doing other personal things, and very little time actually supervising inmates.

94. The dangerous conditions at Donaldson have been so prevalent for such a long time that the substantial risk to inmates in Donaldson is obvious simply from being inside the prison, which is a part of each of the Defendants' jobs.

95. Furthermore, all Defendants knew of the danger specific to H-dorm and the need to have correctional-staff presence in that dorm on the night shift because three inmates had been stabbed in that dorm just five days before Bradley was stabbed. Upon information and belief, Defendant Administrative Supervisors and Defendant Facility Supervisors knew of that stabbing because it was a serious assault in one of the prisons those defendants oversaw and their positions required them to be aware of serious assaults within the prisons. And Defendant Correctional Officers knew of that stabbing because they had both been on shift when that stabbing occurred.

96. The dangerous conditions at Donaldson are also well known in the broader community. Local, state, and national news outlets report regularly about the violence, drugs, understaffing, and overcrowding within ADOC facilities and at Donaldson specifically.

***Defendants Failed to Respond Reasonably to the Unconstitutional Conditions at Donaldson***

97. By virtue of their positions in the ADOC, all Defendants had the authority and ability to minimize the unconstitutional risk of harm to inmates at Donaldson and to Kendall specifically. Nevertheless, all Defendants failed to respond reasonably to that risk.

21

98.     The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to create and enforce policies and procedures at Donaldson that would have minimized the violence, sexual assault, and presence of weapons and drugs within Donaldson. These defendants nevertheless failed to implement and/or enforce such policies and procedures.

99.     The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to create and enforce policies and procedures at Donaldson that would have improved the staff culture in ways that would have both (a) decreased the understaffing at Donaldson by making Donaldson a more attractive place to work, making it easier to hire correctional staff and (b) increased the supervision of inmates by Donaldson existing correctional staff. These defendants nevertheless failed to implement and/or enforce such policies and procedures.

100.    The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to create and enforce policies and procedures at Donaldson that would have decreased the dangerous effects of overcrowding at Donaldson. These defendants nevertheless failed to implement and/or enforce such policies and procedures.

101.    The Defendant Administrative Supervisors, the Defendant Facility Supervisors, and Defendants Wheat, Bell, and Godsey were all in positions to train and/or discipline Donaldson personnel in ways that would have both (a) increased correctional officers' supervision of inmates and (b) decreased the number of weapons and the amount of drugs present within Donaldson. These defendants nevertheless failed to adequately train and/or discipline Donaldson personnel.

102.    Defendants Wheat, Bell, Godsey, and Fox, as correctional officers working in Donaldson, could have increased supervision of inmates, decreased the weapons and drugs present

within Donaldson and directly increased the safety of inmates at Donaldson by adequately fulfilling their assigned duties.

103.    Defendant John Doe LESD Officer 1, as the LESD Officer responsible for investigating Kendall's July rape, could have personally prevented Kendall's later extortion, assaults, beating, rapes, and suicide attempt by adequately fulfilling his assigned duties to investigate Kendall's rape and ensure that Kendall was protected from retribution for reporting his rape.

104.    Each of Defendants' failures described above, as well as other failures by Defendants that are yet unknown, caused Kendall to be physically and sexually assaulted and extorted for the nine months he was at Donaldson.

## CAUSES OF ACTION

### <u>COUNT I</u>
### Violation of the Eighth Amendment – Defendant Administrative Supervisors and Defendant Facility Supervisors
### *Failure to Protect from a Known, Substantial Risk of Serious Harm*

105.    Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint.

106.    The Defendant Administrative Supervisors and the Defendant Facility Supervisors were each responsible for ensuring the safety of all prisoners at Donaldson, including Plaintiff.

107.    The conditions at Donaldson, including the pervasive and normalized culture of violence, chronic understaffing, corruption, lack of inmate supervision, and ready access to weapons and contraband, posed a substantial risk of serious harm from inmate-on-inmate violence to all inmates at Donaldson, including Plaintiff.

108.    These conditions and the resulting risk of serious harm have been well-documented and widely known for years, including in the years before the events that form the basis of this Complaint. The risk of harm is also readily apparent to any individual inside Donaldson.

23

109. The Defendant Administrative Supervisors and the Defendant Facility Supervisors each have known about this substantial risk of serious harm to every inmate at Donalson, including to Plaintiff.

110. The Defendant Administrative Supervisors and the Defendant Facility Supervisors, by virtue of their position, each had the ability and authority to address the conditions that led to the substantial risk of serious harm.

111. Nevertheless, the Defendant Administrative Supervisors and the Defendant Facility Supervisors each failed to take reasonable action to address these conditions. For example, the Defendant Administrative Supervisors and the Defendant Facility Supervisors failed to enact, enforce, and/or follow reasonable policies and procedures designed to provide adequate security and supervision at Donaldson; failed to discipline and/or train correctional staff when correctional staff failed to provide adequate security and supervision at Donaldson; failed to address known security deficiencies, such as lack of intercoms, operative security cameras, and mirrors; and exacerbated the risk and condoned the conduct and conditions creating this substantial risk of serious harm at Donaldson.

112. The misconduct described in this count was objectively unreasonable and was undertaken willfully, intentionally, maliciously, and/or with deliberate indifference to the substantial risk of serious harm to Plaintiff, in violation of his constitutional rights.

113. The misconduct described in this count directly and proximately caused Plaintiff to be subjected to a substantial risk of serious harm and to suffer serious physical and emotional injuries, ongoing anxiety, flashbacks, nightmares, and difficulty sleeping.

24

## COUNT II
### Violation of the Eighth Amendment – Defendant Correctional Officers
*Failure to Protect from a Known, Substantial Risk of Serious Harm*

114.    Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint.

115.    The Defendant Correctional Officers were responsible for ensuring the safety of all prisoners at Donaldson, including Plaintiff.

116.    The conditions at Donaldson, including the pervasive and normalized culture of violence, chronic understaffing, corruption, lack of inmate supervision, and ready access to weapons and contraband, posed a substantial risk of serious harm from inmate-on-inmate violence to all inmates at Donaldson, including Plaintiff.

117.    These conditions and the resulting risk of serious harm have been well-documented and widely known for years, including in the years before the events that form the basis of this complaint. The risk of harm is also readily apparent to any individual inside Donaldson.

118.    The Defendant Correctional Officers have known about this substantial risk of serious harm to every inmate at Donaldson, including to Plaintiff.

119.    The Defendant Correctional Officers, by virtue of their position, had the ability and authority to address the conditions that led to the substantial risk of serious harm.

120.    The misconduct described in this count was objectively unreasonable and was undertaken willfully, intentionally, maliciously, and/or with deliberate indifference to the substantial risk of serious harm to Plaintiff, in violation of his constitutional rights.

121.    The misconduct described in this count directly and proximately caused Plaintiff to be subjected to a substantial risk of serious harm and to suffer serious physical and emotional injuries, ongoing anxiety, flashbacks, and difficulty sleeping.

**COUNT III**
**Violation of the Eighth Amendment – Defendant John Doe LESD Officer 1**
*Failure to Protect from a Known, Substantial Risk of Serious Harm*

122.    Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint.

123.    The Defendant Correctional Officers were responsible for ensuring the safety of all prisoners at Donaldson, including Plaintiff.

124.    The conditions at Donaldson, including the pervasive and normalized culture of violence, chronic understaffing, corruption, lack of inmate supervision, and ready access to weapons and contraband, posed a substantial risk of serious harm from inmate-on-inmate violence to all inmates at Donaldson, including Plaintiff.

125.    These conditions and the resulting risk of serious harm have been well-documented and widely known for years, including in the years before the events that form the basis of this complaint. The risk of harm is also readily apparent to any individual inside Donaldson.

126.    The Defendant Correctional Officers have known about this substantial risk of serious harm to every inmate at Donaldson, including to Plaintiff.

127.    The misconduct described in this count was objectively unreasonable and was undertaken willfully, intentionally, maliciously, and/or with deliberate indifference to the substantial risk of serious harm to Plaintiff, in violation of his constitutional rights.

128.    The misconduct described in this count directly and proximately caused Plaintiff to be subjected to a substantial risk of serious harm and to suffer serious physical and emotional injuries, ongoing anxiety, flashbacks, and difficulty sleeping.

**COUNT IV**
**Violation of the Eighth Amendment – Defendant Administrative Supervisors and Defendant Facility Supervisors**
*Supervisory Liability: Failure to Protect from a Known, Substantial Risk of Serious Harm*

129.    Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint.

26

130.    Through the actions described in paragraphs 111 through 122 above, the Defendant Correctional Officers violated Plaintiff's Eighth Amendment rights.

131.    By virtue of their supervisory positions, each of the Defendant Administrative Supervisors and the Defendant Facility Supervisors was responsible for training and supervising Donaldson's correctional staff, including the Defendant Correctional Officers, to ensure that they took reasonable steps to protect inmates at Donaldson, including Plaintiff.

132.    As described above, despite knowing of the need to adequately train and/or supervise Donaldson's correctional staff, including the Defendant Correctional Officers, to ensure that they took reasonable steps to protect inmates at Donaldson, including Plaintiff, the Defendant Administrative Supervisors and the Defendant Facility Supervisors failed to do so.

133.    The Defendant Administrative Supervisors' and the Defendant Facility Supervisors' failure to train and/or supervise Donaldson's correctional staff, including the Defendant Correctional Officers, resulted in those individuals failing to take reasonable steps to protect Plaintiff, despite knowing that he faced a substantial risk of serious harm.

134.    The misconduct described in this count was objectively unreasonable and was undertaken willfully, intentionally, maliciously, and/or with deliberate indifference to the substantial risk of serious harm to Plaintiff, in violation of his constitutional rights.

135.    The misconduct described in this count directly and proximately caused Plaintiff to be subjected to a substantial risk of serious harm and to suffer serious physical and emotional injuries, ongoing anxiety, flashbacks, and difficulty sleeping.

## COUNT V
### State Law Negligence & Wantonness – All Defendants

136.    Plaintiffs incorporates by reference paragraphs 1 through 104 of this Complaint.

137. Because of their professional roles, Defendants each owe a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC, including Plaintiff.

138. Defendants each breached the standard of care they owe to Plaintiff by the actions described above.

139. Defendants' breach of the duty of care they owe to Plaintiffs resulted in Plaintiff being subjected to numerous physical assaults, sexual assaults, and extortion, as described above.

140. The risks and harms that Defendants caused are within the scope of protection afforded by the duties Defendants owe to Plaintiff.

141. Defendants knew that their failures described above and the breach of their duties to Plaintiff subjected Plaintiff to an unreasonably high risk of physical and sexual assault and extortion because of the conditions at Donaldson described above made it obvious that Plaintiff faces such a high risk. These failures amounted to a conscious and/or reckless disregard of the rights and safety of others, including the rights and safety of Plaintiff.

142. As a result of Defendants' acts and omissions, Plaintiff suffered actual, foreseeable harm, as described in this Complaint, including serious physical and emotional injuries, ongoing anxiety, flashbacks, and difficulty sleeping.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court enter judgment against all the defendants, jointly and severally, and also order as follows:

a. Find in favor of Plaintiff on all counts;

b. Award compensatory damages to Plaintiff, against all defendants, in an amount to be determined at trial;

28

c.    Award punitive damages to Plaintiff, and against all defendants, in an amount to be determined at trial;

d.    Award Plaintiff recovery of attorneys' fees and other costs; and

e.    Award any other relief the Court deems appropriate.

Respectfully submitted this 11th day of July 2025.

*/s/ Susanne Emily Cordner*
Susanne Emily Cordner
(ASB-4687-C61N)
Joseph Mitchell McGuire
(ASB-8317-S69M)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000
scordner@mandabusinesslaw.com
jmcguire@mandabusinesslaw.com

*Attorneys for Plaintiff*